UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

NORTH AMERICAN DEALER CO-OP,    )
                                )
    Plaintiff,                  )
                                )
    v.                          )   3:11-cv-698-RCJ-VPC
                                )
DICK L. ROTTMAN et al.,         )   **ORDER**
                                )
    Defendants.                 )
_____)

    Currently before the Court are a Motion for Order to Show Cause Why Prejudgment Writ of Attachment Should Not Issue (#16) and a Motion to Dismiss First Amended Complaint (#24). The Court heard oral argument on March 26, 2012.

### BACKGROUND

    In September 2011, Plaintiff North American Dealer Co-op ("Plaintiff") filed a complaint in this Court. (Compl. (#1) at 1). On December 1, 2011, Plaintiff filed its First Amended Complaint ("FAC") against Defendants Dick L. Rottman, Jeffrey P. Shaffer, Janice Lynn Bowman, Carol B. Ingalls, Bradley A. Pearce, R. Scott Rottman (collectively "Individual Defendants"), A and H Insurance, Inc., and Western Thrift & Loan (collectively "Defendants"). (FAC (#22) at 1).

    The complaint alleged the following. Plaintiff was a cooperative association consisting of automobile dealers located in the United States. (*Id.* at 3). Plaintiff offered member dealers an extended service contract reimbursement program ("the Program"), which helped facilitate the sales of extended service contracts by member dealers to their customers who purchased new or used automobiles. (*Id.*). Plaintiff entered into an agreement with Western Insurance

Company ("WIC"), then a Nevada insurance company, to provide a surety bond to Plaintiff and its member dealers guaranteeing the payment of any money back reimbursements due under the Program. (*Id.* at 3-4). WIC agreed to administer and control a member dealer collateral reserve account in which member dealers paid "reserves" to cover anticipated reimbursement claims arising under the Program. (*Id.* at 4). As part of the Program, member dealers set aside a "reserve" for each extended service contract which was provided with a money back guarantee. (*Id.*). The reserve was intended to pay all future reimbursement claims that could be made against the member dealer. (*Id.*).

The complaint alleged the following. Plaintiff, through its administrator, the National Administrator Dealer Services, Inc. ("NADS"), provided administrative services to dealer members in the Program, including maintaining necessary records, verifying valid claims, and submitting approved claims to WIC for payment. (*Id.*). WIC administered and controlled the reserves on behalf of Plaintiff and its member dealers. (*Id.*). WIC set the reserve amount payable for each money back guarantee issued and held the reserves in a fiduciary capacity in a "collateral reserve fund" for Plaintiff and its member dealers. (*Id.*). To protect against the possibility that the member dealers' own reserves in the collateral reserve fund might be insufficient to pay all claims made against the outstanding money back guarantees, Plaintiff's member dealers were protected by a surety bond issued by WIC. (*Id.*). The surety bond was intended to pay all valid outstanding reimbursement claims in the event that the collateral reserve fund became depleted. (*Id.*). On April 1, 2004, WIC and Plaintiff entered into a contract called the Vehicle Contract Reimbursement Guarantee Performance Contract ("the WIC Bond"). (*Id.*). The WIC Bond was a surety bond issued to Plaintiff and its member dealers. (*Id.*).

The complaint alleged the following. Access Insurance Services, Inc. ("Access") served as the managing general agent for WIC. (*Id.* at 5). Access was responsible for WIC's performance under the surety bond and was required to manage, administer, and protect the collateral reserve account created pursuant to the surety bond. (*Id.*). Pursuant to the WIC Bond, member dealers deposited $60 into the collateral reserve account per contract sold with

2

a money back guarantee, as set by WIC. (*Id.*). WIC would periodically adjust the collateral reserve amount through written notice to Plaintiff. (*Id.*). The collateral reserve account was closely monitored by WIC and Access to ensure that it was adequately funded. (*Id.* at 6). Plaintiff collected reserve funds from its member dealers and forwarded the funds to WIC or Access pursuant to the WIC Bond. (*Id.*). The reserves were then retained by WIC or Access in the collateral reserve account. (*Id.*). The collateral reserve account was segregated in investment and accounting records by Access and the funds held in the collateral reserve account were not available to other creditors even if WIC had filed bankruptcy. (*Id.*). Neither Plaintiff nor NADS had control over or access to the funds retained in the collateral reserve account. (*Id.*).

The complaint alleged the following. Member dealers submitted reimbursement claims under the money back guarantee to NADS. (*Id.*). NADS investigated each claim for compliance with the Program and forwarded approved and valid claims to WIC for payment out of the collateral reserve account. (*Id.* at 7). WIC or Access would pay the approved claims out of the collateral reserve account. (*Id.*). Since April 1, 2004, member dealers have paid $17,000,000 in reserves to WIC to deposit into the collateral reserve account. (*Id.* at 6). Since April 1, 2004, $9,000,000 have been paid out of the collateral reserve account in payment of reimbursement claims approved by NADS and submitted to WIC for payment. (*Id.* at 7). As of December 2011, the collateral reserve account should have had a balance of $8,250,000. (*Id.*).

The complaint alleged the following. On December 23, 2010, WIC dissolved its corporate existence in Nevada effective December 31, 2010, without notice to Plaintiff or NADS. (*Id.*). Since the date of dissolution, neither WIC nor Access have provided any formal notice to Plaintiff or NADS about the current status of the collateral reserve account. (*Id.*). Beginning in May 2011, WIC failed to pay out the approved reimbursement claims from the collateral reserve account. (*Id.*). Pursuant to the WIC Bond, WIC was required to make reimbursement payments out of the collateral reserve account within 30 days of receiving approved claims. (*Id.* at 8). Plaintiff and NADS have submitted over 921 claims to WIC. (*Id.*).

3

Of those claims, 552 have been submitted to WIC for more than 30 days and remain unpaid in the amount of $956,485.69. (*Id.*). The remaining 369 claims that remain unpaid have a value of $611,493.14. (*Id.*). Plaintiff has written several demand letters to WIC and Access that they immediately pay all outstanding reimbursement claims. (*Id.*). Plaintiff wrote a demand letter to WIC and Access to confirm in writing that the collateral reserve account was a separate account held in a fiduciary capacity solely for the benefit of Plaintiff and its member dealers and that WIC and Access have never used any of the funds for any purpose other than to make claim reimbursements for the Program. (*Id.* at 8-9). WIC and Access have failed to respond to the demand letter. (*Id.* at 9).

The complaint alleged the following. On July 1, 2011, the United States Treasury Department delisted WIC preventing it from writing bonds for federal construction projects. (*Id.*). On July 13, 2011, a financial rating company downgraded WIC's financial strength from B++ to B. (*Id.*). On August 18, 2011, the Utah Department of Insurance, the government entity that now regulated WIC, commenced an investigation into WIC's solvency. (*Id.* at 10). The Utah Department of Insurance found that WIC was insolvent and took over its operations. (*Id.*). On September 1, 2011, Access filed for Chapter 11 bankruptcy in Reno, Nevada. (*Id.*).

The complaint alleged the following. Individual Defendants were shareholders, directors, and/or officers of both WIC and Access. (*Id.*). Individual Defendants "misappropriated, or allowed the misappropriation of, funds from the collateral reserve account" and "wrongfully commingled the collateral reserve funds with other funds." (*Id.*). Individual Defendants illegally took the funds held in a fiduciary capacity in the collateral reserve account and misappropriated the funds for themselves or the other organizations that they owned and controlled. (*Id.*). Individual Defendants illegally misappropriated funds from the collateral reserve account and transferred them to Defendant A and H Insurance, Inc. ("A&H") and Defendant Western Thrift & Loan ("Western Thrift"). (*Id.* at 10-11). Individual Defendants were officers, directors, shareholders, and/or owners of both A&H and Western Thrift. (*Id.* at 11). WIC and Access were used by Individual Defendants as a pass-through shell for each Individual Defendant's individual benefit. (*Id.*). WIC and Access were

4

inseparable from Individual Defendants because of the unity of interest and ownership. (*Id.*). Individual Defendants governed and influenced WIC and Access and undercapitalized those entities. (*Id.*). Individual Defendants were alter egos of WIC and Access and separate corporate existence of WIC and Access should be disregarded and Individual Defendants should be "adjudged jointly and severally liable." (*Id.*).

Plaintiff alleged eight causes of action. In the first cause of action, Plaintiff alleged breach of fiduciary duty against Individual Defendants. (*Id.* at 12). Plaintiff alleged that Individual Defendants owed Plaintiff and its member dealers a fiduciary duty with respect to the collateral reserve account. (*Id.*). Individual Defendants "intentionally failed to act in good faith and solely for the benefit" of Plaintiff and its member dealers and breached their fiduciary duties by failing to properly maintain, administer and protect the reserve account by misappropriating funds. (*Id.*).

In the second cause of action, Plaintiff alleged conversion against Individual Defendants. (*Id.* at 13). Individual Defendants "converted and misappropriated funds in the collateral reserve account, taking such funds for the Individual Defendants' personal benefit without the knowledge or consent" of Plaintiff. (*Id.*). Individual Defendants converted the funds because they directed WIC and Access not to release funds from the collateral reserve account upon presentation of the approved reimbursement claims. (*Id.*).

In the third cause of action, Plaintiff alleged embezzlement pursuant to NRS § 683A.400 against Defendants Dick Rottman and Jeffrey P. Shaffer. (*Id.* at 14). Plaintiff alleged that Rottman and Shaffer were responsible for the protection of the collateral reserve funds and maintained exclusive control over those funds for WIC and Access. (*Id.*). Rottman and Shaffer misappropriated funds from the collateral reserve account and used the funds to continue running WIC and Access and other entities controlled by Individual Defendants for the direct benefit of Rottman and Shaffer. (*Id.* at 15).

In the fourth cause of action, Plaintiff alleged fraudulent transfers against all Defendants. (*Id.* at 16). Plaintiff was a creditor of WIC and Access. (*Id.*). Individual Defendants made unauthorized transfers out of the collateral reserve account with actual

intent to hinder, delay, or defraud Plaintiff. (*Id.*). WIC and Access were insolvent at the time the Individual Defendants made unauthorized transfers out of the collateral reserve account or they became insolvent as a result of such transfers. (*Id.*). Any unauthorized diversions from the collateral reserve account were actively concealed by Individual Defendants with actual intent to defraud Plaintiff and its member dealers. (*Id.*). Individual Defendants made unauthorized diversions because WIC and Access did not have adequate working capital and were in financial distress. (*Id.*).

In the fifth cause of action, Plaintiff alleged fraud against the Individual Defendants. (*Id.* at 17). Individual Defendants "fraudulently misrepresented" that the funds that Plaintiff and its member dealers had paid to WIC were going to be held in a collateral reserve trust account in a fiduciary capacity for Plaintiff. (*Id.*). Plaintiff relied on Individual Defendants' representations in deciding to contract with WIC and, but for those representations, Plaintiff would not have contracted with WIC. (*Id.*).

In the sixth cause of action, Plaintiff alleged constructive trust against all Defendants. (*Id.* at 18). Plaintiff was the rightful owner of any funds held in the collateral reserve account or any funds improperly transferred out of that account to other entities owned by Individual Defendants, including A&H and Western Thrift. (*Id.*).

In the seventh cause of action, Plaintiff alleged negligent misrepresentation against Individual Defendants. (*Id.*). Individual Defendants communicated to Plaintiff that the collateral reserve account was fully segregated from other accounts and was fully funded. (*Id.* at 19). Individual Defendants failed to exercise reasonable care or competence in obtaining or communicating the information to Plaintiff regarding the status and disposition of the collateral reserve fund. (*Id.*).

In the eighth cause of action, Plaintiff alleged civil conspiracy against Individual Defendants. (*Id.*). Individual Defendants acted in concert to convert funds held in the collateral reserve account. (*Id.*). Plaintiff sought damages for all misappropriated funds from the collateral reserve, direct and incidental damages, punitive damages, constructive trust, and attorneys' fees and costs. (*Id.* at 20).

6

## LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must accept as true all factual allegations in the complaint as well as all reasonable inferences that may be drawn from such allegations. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1150 n.2 (9th Cir. 2000). Such allegations must be construed in the light most favorable to the nonmoving party. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). In general, the court should only look to the contents of the complaint during its review of a Rule 12(b)(6) motion to dismiss. However, the court may consider documents attached to the complaint or referred to in the complaint whose authenticity no party questions. *Id.*; *see Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987).

The analysis and purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (quotations omitted). To avoid a Rule 12(b)(6) dismissal, a complaint does not need detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (stating that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). Even though a complaint does not need "detailed factual allegations" to pass muster under 12(b)(6) consideration, the factual allegations "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

enhancements.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1966).

If the court grants a motion to dismiss a complaint, it must then decide whether to grant leave to amend. The court should "freely give" leave to amend when there is no "undue delay, bad faith or dilatory motive on the part of the movant . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Generally, leave to amend is only denied when it is clear that the deficiencies of the complaint cannot be cured by amendment. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

## DISCUSSION

**I.    Motion to Dismiss First Amended Complaint for Damages (#24)**

Defendants argue that the FAC is predicated on a finding that Plaintiff can pierce the corporate veil of WIC and Access to hold the officers and directors of those two companies liable. (Mot. to Dismiss (#24) at 2). Defendants argue that there are no facts to support piercing the corporate veil because Plaintiffs have not plead an alter ego claim against Individual Defendants because the FAC only recites bare bones elements and legal conclusions for alter ego liability. (*Id.* at 8). Defendants argue that the fiduciary claim fails as a matter of law because, although WIC and Plaintiff may have had a fiduciary duty, there is none between Plaintiff and the Individual Defendants. (*Id.* at 10-11). Defendants assert that the other claims should be dismissed because they are pled in a conclusory fashion and are not pled with Rule 9(b) specificity. (*Id.* at 11-16). Defendants also assert that constructive trust is not available because there is no confidential relationship between Plaintiff and Individual Defendants and there are no allegations supporting the inadequacy of monetary damages. (*Id.* at 16).

In response, Plaintiff asserts that this is not an action concerning piercing the veil because the action is premised upon the tortious and fraudulent conduct of Individual Defendants and not the tortious conduct of Western and Access. (Opp'n to Mot. to Dismiss (#33) at 7, 12). Plaintiff asserts that, if the Court does find that piercing the corporate veil is

necessary, that it has pled the requirements to pierce the corporate veil. (*Id.* at 12). Plaintiff argues that it has pled sufficient facts to state a claim for all of its causes of action. (*Id.* at 14-27).

In reply, Defendants assert that the FAC does not set forth individual actions by the Individual Defendants but instead refers to conduct by WIC and Access. (Reply to Mot. to Dismiss (#35) at 2). Defendants also assert that there are no factual allegations against Defendants Carol Ingalls, Bradley Pearce, and R. Scott Rottman and that they should be dismissed from the case. (*Id.* at 4). Defendants assert that there are no factual allegations that justify piercing the corporate veil of WIC or Access. (*Id.*).

Pursuant to the discussions at oral argument, the Court grants the motion to dismiss (#24) in its entirety with leave to amend. Plaintiff must clearly lay out allegations of fraud against the Individual Defendants pursuant to Fed. R. Civ. P. 9(b). Under Rule 9(b), a plaintiff must be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* A "plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id.*

**II.     Motion for Order to Show Cause Why Prejudgment Writ of Attachment Should Not Issue (#16)**

Plaintiff moves for an order directing Defendants to show cause why a prejudgment writ of attachment should not issue pursuant to NRS § 31.010(1) *et seq.* (Mot. to Show Cause (#16) at 10). Plaintiff argues that its claims are valid. (*Id.* at 11-14).

In response, Defendants argue that, in Nevada, a prejudgment writ of attachment only applies to contract-based actions and not tort-based actions. (Opp'n to Mot. to Show Cause (#23) at 5-6). Defendants argue that Plaintiff has not alleged any extraordinary circumstances justifying a prejudgment writ of attachment. (*Id.* at 7-8). Defendants also assert that they have meritorious defenses to Plaintiff's claims. (*Id.* at 8-18).

Plaintiff filed a reply.  (Reply to Mot. to Show Cause (#25)).

In this case, the Court denies the motion for order to show cause why prejudgment writ of attachment should not issue (#16) because there is no valid complaint at this time.

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that the Motion for Order to Show Cause Why Prejudgment Writ of Attachment Should Not Issue (#16) is DENIED.

IT IS FURTHER ORDERED that the Motion to Dismiss First Amended Complaint for Damage (#24) is GRANTED in its entirety with leave to amend.

DATED:  This 6th day of July, 2012.

_____
United States District Judge